# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| SALIM BILAL-EDWARDS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-2220 (RBW) |
| | ) | |
| UNITED PLANNING ORGANIZATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## MEMORANDUM OPINION

The plaintiff in this civil case, Salim Bilal-Edwards, filed a six-count complaint against

the defendants, the United Planning Organization ("UPO") and two individuals, De Angelo

Rorie and Andrea Thomas, alleging claims of wrongful termination, negligence, extreme and

outrageous conduct, hostile work environment, and retaliation under the Whistleblower

Protection Act, 5 U.S.C. § 2302(b) (2006), and violation of the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634 (2006). The Court dismissed all the

claims except for the plaintiff's ADEA claim in prior rulings. See Bilal-Edwards v. United

Planning Org., 896 F. Supp. 2d 88, 93-98 (D.D.C. 2012) (dismissing the plaintiff's claims of

wrongful termination, negligence, extreme and outrageous conduct, and hostile work

environment); ECF No. 58 (dismissing the plaintiff's Whistleblower Protection Act claim).

Currently before the Court are the parties' cross motions for summary judgment on the plaintiff's

remaining age discrimination claim. See generally Plaintiff's Motion for Summary Judgment

("Pl.'s Mot."); [1] Defendants' Motion for Partial Summary Judgment ("Defs.' Mot."). The plaintiff also seeks leave to amend his complaint. See generally Motion to Amend Complaint ("Pl.'s Amend Mot."). Upon careful consideration of the parties' submissions, [2] the Court concludes that the defendants' motion for summary judgment must be granted, and the plaintiff's motions for summary judgment and to amend his complaint must be denied.

## I. BACKGROUND

The following facts are undisputed. [3] The UPO "is the Community Action Agency for the District of Columbia," and "is a 501(c)(3) tax exempt organization." Defs.' Facts ¶ 1. "During [the] [p]laintiff's period of employment at [the] UPO, it was comprised of" various programs and

---

[1] The plaintiff's filing includes several documents with duplicate titles. For ease of reference, the Court refers to the entire filing by the title on the first page, Plaintiff's Motion for Summary Judgment, and refers to the ECF page numbers assigned when the filing was docketed.

[2] In addition to the submissions already identified, the Court considered the following submissions made by the parties in rendering its decision: (1) the Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Opp'n"); (2) the Plaintiff's Response to Defendants' Opposition to Plaintiff's Summary Judgment ("Pl.'s Reply"); (3) the Defendants' Statement of Material Facts as to Which There is no Genuine Issue ("Defs.' Facts"); (4) the Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment ("Pl.'s Opp'n"); (5) the defendants' Reply Memorandum in Support of Defendants' Motion for Partial Summary Judgment ("Defs.' Reply"); (6) the Plaintiff's Response to Defendants' Reply in Support of Defendants' Motion for Partial Summary Judgment; (7) the Sur-Sur-Reply Memorandum in Support of Defendants' Motion for Partial Summary Judgment; (8) the Defendants' Opposition to Plaintiff's Motion to Amend Complaint ("Defs.' Amend Opp'n"); (9) the Response to Defendants' Opposition to Plaintiff's Motion to Amend Complaint ("Pl.'s Amend Reply"); (10) the plaintiff's Request for Document to be Entered into Court Records ("Pl.'s Req."); and (11) the Defendants' Opposition to Plaintiff's Request for Document to be Entered into Court Records.

Although the plaintiff's Request for Document to be Entered into Court Records was filed well after the completion of summary judgment briefing, the Court grants the plaintiff's Request, which the Court construes as a motion to supplement the exhibits submitted with his motion for summary judgment.

[3] The plaintiff failed to file a separate statement of undisputed fact as required by Local Civil Rule 7(h)(1). To the extent that he includes headings in his pleadings referencing the facts on which he is relying, he largely fails to cite to the record. And although the plaintiff purports to support his arguments with the substance of what he contends are "telephone depositions of several" UPO employees, Pls.' Mot. at 12, the Court cannot consider them. This proscription is required because the answers to the purported deposition questions were prepared by the plaintiff, Defs.' Facts, Ex. F (Salim Bilal-Edwards Deposition Transcript ("Pl. Dep. Tr.")) at 16:9-17:25, and there being no indication that the deponents or declarants adopted the statements, the statements constitute inadmissible hearsay. See Fed. R. Evid. 801(c), 802. Accordingly, the Court must rely on the Defendants' Statement of Material Facts as to Which There is no Genuine Issue. Cf. Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

divisions, including the Youth Services Division ("Division"). Id. The "UPO receives a variety of grants and contracts from the federal government and the District of Columbia government," some of which support the activities of the Division. Id. ¶ 2; see also id. ¶¶ 3-4. Among the grants and contracts was "a grant from the U.S. Dream Academy to help fund the programs at the [UPO's] James Creek location." Id. ¶ 2. The "UPO also receives some private funding," including funding for the Division's Beaver Scholarship program. Id. ¶ 4.

Defendant Andrea Thomas "was hired as the first Director of the" Division at the UPO in 2007. Id. ¶ 5. The Division expanded in 2009, and the "UPO hired an Assistant Director." Id. Thomas "and then Chief Operating Officer . . . , Gladys Mack, recommended [that the] [p]laintiff be hired as the Assistant Director," id. (citing Defs.' Facts, Exhibit ("Ex.") A (Declaration of Andrea Thomas ("Thomas Decl.")) ¶ 7), and the "[p]laintiff commenced his employment with [the] UPO on March 23, 2009, as the Assistant Director of the" Division, id. ¶ 6 (citing Defs.' Facts, Exs. C (New Hire Request Form dated March 23, 2009), D (March 13, 2009 Employment Offer Letter ("Offer Letter"))). The plaintiff "was an at-will, salaried, exempt employee," id. (citing Defs.' Facts, Ex. D (Offer Letter)), and he was initially supervised by Thomas, id. 6. The plaintiff's duties at the UPO included "assisting the [Division] Director in the daily administration of [D]ivision projects as directed and assigned, and to work with other [Division] staff to ensure coordinated efforts." Id. (citing Defs.' Facts, Ex. E (Youth Services Division Assistant Director Job Description ("Job Description")). In particular, the "[p]laintiff was assigned the responsibility of overseeing and implementing the [Division's] program at James Creek," which is a "community in southwest Washington, D.C." Id. ¶ 11.

"In or about October 2009, some of the [Division] staff moved into [a] recently renovated space commonly referred to within [the] UPO as the Alabama Avenue facility or just 'Alabama Avenue.'" Id. ¶ 43. Other staff from the Division also moved to the Alabama Avenue facility "later in late 2009 or early 2010." Id. Division employees "whose desks were adjacent to a rest room area, noticed a periodic strong odor," and "complained about the odor." Id. "Of the five [Division] staff located in the part of the building where the odor was strongest, only [the] [p]laintiff" and another employee were over 40. Id. ¶ 44. The UPO "undertook efforts directly and through the building management company to try to determine the source of the odor and remediate it" after receiving a written complaint from an employee who was under the age of 40. Id.

On October 1, 2009, Thomas became the UPO's Chief of Staff. Id. ¶ 7. She "continued to also serve as the Director" of the Division "until the new Director was hired and began service." Id. The "UPO hired De Angelo Rorie, the other individual defendant, as the new Director of the [Division] on November 9, 2009." Id. ¶ 10. Rorie then became the plaintiff's immediate supervisor. Id.

Around the same time that Rorie commenced his employment with the UPO, the Division also selected Tina Dawson as "a part-time Youth Services Worker to operate the youth programs at James Creek." Id. ¶ 12. After Dawson was notified "that she had been selected for the . . . position," the UPO began a required "pre-employment screening including drug testing, and . . . criminal background checks and the [District of Columbia] Child Protection Register check." Id. While the screening was ongoing, the "UPO considered other staffing options to move the implementation of youth services at James Creek forward." Id. ¶ 13.

Initially, "Rorie spoke with Jemeka Brown, a [Division] Case Manager for the Providing Opportunities with Educational Readiness Program known as 'P.O.W.E.R.', about changing positions in the [Division]." Id. ¶ 14. Rorie wanted Brown "to consider changing from her Case Manager position with the P.O.W.E.R. program, to the Youth Services Worker position at James Creek," which "would have entailed a formal change in positions, responsibilities, and hours." Id. Brown "was not interested in changing positions," because "she was a graduate student at Howard University and also had an internship, and the scheduled hours for James Creek would have conflicted." Id. "As a result of those obligations, she informed [] Rorie that she was not available for the times needed to staff James Creek and that she would resign if he directed her to take the James Creek assignment." Id. (citing Defs.' Facts, Ex. K (Declaration of Jemeka Brown ("Brown Decl.")) ¶¶ 4, 6-7).

"[I]n late 2009 or early 2010, [] Rorie spoke with DeVita Lanham, another [Division] Case Manager, about changing positions in the [Division]." Id. ¶ 15. He explained to Lanham "that ongoing funding for her position" was "questionable" because of grant uncertainties. Id. Rorie asked "if she was interested in changing jobs from her full-time Case Manager position to the part-time Youth Services Worker position at James Creek." Id. "Lanham declined the offer to transfer positions and to go from full-time to part-time." Id.

Also "[i]n late 2009 or early 2010," Thomas spoke with both Lanham "and LaShawn Reeder, a Retention Placement Specialist who shared duties with [] Lanham, regarding several issues related to the [Division]," including the funding uncertainties surrounding both Lanham and Reeder's positions. Id. ¶ 16. Thomas additionally "raised the issue of needing to get the youth program at James Creek up and running" and "indicated that the Division may need their

assistance with this project." Id.  Both Lanham and Reeder "agreed to help" and "understood that they were not being offered the position and that their help would be temporary, since [] Dawson was selected for the position and was going through the pre-employment screening process." Id. (citing Defs.' Facts, Exs. A (Thomas Decl.) ¶ 15, L (Declaration of LaShawn Reeder ("Reeder Decl.")) ¶ 11).

Rorie spoke with the plaintiff "on or about January 28 and 29, 2010, regarding [the Division's] need for [the] [p]laintiff to take a more active role to implement the program at James Creek." Id. ¶ 18.  Rorie asked the "[p]laintiff to oversee the program and implement the program, including recruiting youth and starting up performance of the services by working at the site for several hours a day, three days per week, until the new Youth Services Worker commenced employment." Id.  Rorie told the "[p]laintiff that this was a temporary responsibility, it was not a demotion or job transfer, and it would not result in a reduction of pay," and that the "[p]laintiff was to get the program off the ground until the new Youth Services Worker was hired." Id.  However, the "[p]laintiff refused to do what was necessary to implement the program at James Creek by taking up those duties for the requested three days per week for several hours each day." Id. ¶ 19; see also Defs.' Facts, Ex. O (Memoranda from Salim Bilal-Edwards to Human Resources) at 8.

Rorie spoke with Thomas and personnel in the UPO's Human Resources department "regarding how to handle the [p]laintiff's . . . response" to the request that he staff the James Creek project.  Defs.' Facts ¶ 21.  Human Resources personnel and Thomas "suggested [] Rorie issue a written warning," id., and "[o]n or about February 3, 2010, [] Rorie issued the written warning to [the] [p]laintiff." Id. (citing Defs.' Facts, Ex. M (Employee Warning Notice)).  The

warning stated that "[f]ailure to comply with the directive to oversee the start up operations and implementation of the James Creek cite [sic] will result in further disciplinary action up to and including termination."  Defs.' Facts, Ex. M (Employee Warning Notice).

Subsequently, the "[p]laintiff sent an email to [] Rorie following up their conversation about [the] [p]laintiff's concerns with the [written warning], and also sent [Human Resources] a copy of the e-mail."  Defs.' Facts. ¶ 22.  "On or about February 19, 2010, Nnenna Ugorji, then UPO's Human Resources Director, met with [the] [p]laintiff to discuss his concerns," but the meeting did not result in a withdrawal of the warning.  Id. ¶ 23.  "The next day, [the] [p]laintiff sent a follow-up e-mail to [Human Resources] stating that the 'real issue' he tried to express in his prior e-mail was that [] Rorie had engaged in an 'unfair labor practice.'"  Id.  "Human Resources offered to set up a meeting" between the plaintiff and Rorie, but the "[p]laintiff declined, stating that a further meeting was unnecessary, as they understood each other's positions."  Id.  Human Resources "advised [the] [p]laintiff that they found his concerns were unfounded," and "reminded [him] that servicing James Creek was an important obligation of [the] UPO and [] Rorie had full authority to initiate discipline of insubordination by his staff." Id.; see also Defs.' Facts, Ex. U (Email Correspondence).

"Later in February, [] Rorie met with [] Reeder and [] Lanham regarding James Creek," and asked if they would "help start the program at James Creek by sharing the load," which meant each would "cover one day at James Creek and [they would] split coverage for the third day at James Creek, with the other covering their" other shared duties.  Id. ¶ 24.  "This request did not involve a change in position or a reduction in pay," and was a request "to temporarily help with James Creek until the new employee was on board."  Id.  Lanham "voiced displeasure

with this assignment," but both she and Reeder "agreed to assist with the program at James Creek." Id. Rorie, Lanham, and Reeder "met with several other individuals from [the] UPO involved with the other UPO programs at James Creek," and some of these individuals "agreed to help recruit local youth to participate in the [Division's] programs. Id. ¶ 25.

"On or about March 1, 2010," Lanham tendered her resignation, and her "last day [of work] was scheduled for March 25, 2010." Id. ¶ 27. "At or around this time, [] Dawson was cleared to start her employment conditionally, and [Human Resources] issued an offer of employment letter to her on March 11, 2010." Id. ¶ 28. Dawson began working on March 15, 2010, but tendered her resignation the next day. Id.

Rorie "decided that he needed to insist that [the] [p]laintiff implement the program at James Creek until another staff member could be hired to run the program or, if necessary, until the program ended in July." Id. ¶ 30. Rorie consulted Division "staff members who were receiving help from [the] [p]laintiff with their programs. Those staff indicated that while [the] [p]laintiff's assistance would be missed, they could run their programs without him." Id. ¶ 31; see also Defs.' Facts, Ex. G (Declaration of Tanya Henderson ("Henderson Decl.")) ¶¶ 7, 14. Rorie spoke with the plaintiff "on or about March 17, 2010" about "the organization's need for [the] [p]laintiff to implement the program at James Creek until someone was hired to work the program," and "indicated that he no longer had any options but to have [the] [p]laintiff begin to implement the program." Defs.' Facts ¶ 32. The "[p]laintiff demanded that the meeting stop until they had a third party to participate in the meeting." Id. Subsequently, the plaintiff and Rorie met with Human Resources personnel to discuss the matter. Id. The plaintiff ultimately "would not agree to accept th[e] directive" to "run the James Creek program." Id. ¶ 34.

Thereafter, Rorie, with the approval of Thomas, sent a memorandum to Human Resources "recommending [the] [p]laintiff's termination for insubordination and failure to display a behavior standard that is conducive to a positive working atmosphere." Id. ¶ 39; see also Defs.' Facts, Ex. X (April 19, 2010 Memorandum). Human Resources "approved the recommendation to terminate [the] [p]laintiff," Defs.' Facts ¶ 39, and the plaintiff's employment was terminated on May 3, 2010, id. ¶ 40. The "UPO did not fill the position of Assistant Director of the [Division] after [the] [p]laintiff's termination and has no plans to do so." Id. ¶ 42.

The "[p]laintiff filed a charge of discrimination against [the] UPO with the Equal Employment Opportunity Commission ("EEOC") on May 26, 2010, alleging discrimination based on age and sex." Id. ¶ 46; see also Defs.' Facts, Ex. N (EEOC Complaint). The plaintiff's EEOC Complaint states:

> I was asked by the Director along with two younger female employees to accept another job assignment as a Youth Services Worker. The duties of the position were directly related to the positions held by the female employees, but they declined to accept the job assignment. However, the job assignment was a different classification than mine and it was a demotion. On 05/03/2010, I was the only employee that was reprimanded and terminated for refusing to oversee and run a program. The female employees that were asked did not receive any form of discipline or termination for refusing the job assignment.

Defs.' Facts, Ex. N (EEOC Complaint). "On August 9, 2011, the EEOC issued a Dismissal and Notice of Rights after determining that it was 'unable to conclude that the information obtained establishes violations of the statutes.'" Defs.' Facts ¶ 47 (quoting Defs. Facts, Ex. CC (Dismissal of Notice and Rights)).

## II.  STANDARDS OF REVIEW

### A.      Rule 56 Motion for Summary Judgment

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the depositions, affidavits, and other factual materials in the record.  Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  And "a dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006) (quoting Anderson, 477 U.S. at 248).  The moving party bears the initial burden of showing the absence of a disputed material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party to "set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248.  "Although summary judgment is not the occasion for the court to weigh credibility or evidence, summary judgment is appropriate 'if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (citations omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party."  Anderson, 477 U.S. at 249.  In making this assessment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party."  Talavera, 638 F.3d at 308 (citing Anderson, 477 U.S. at 255).

## B.    Rule 15 Motion to Amend

"A party may amend its pleading once as a matter of course" before the adverse party has filed a responsive pleading. Fed. R. Civ. P. 15(a). However, after a responsive pleading has been filed, the initial pleading may be amended "only with the opposing party's written consent or the court's leave." Id. While the Court has sole discretion to grant or deny leave to amend, "[l]eave to amend a [pleading] should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." Richardson v. United States, 193 F.3d 545, 548-49 (D.C. Cir. 1999) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). The rationale for this perspective is that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman, 371 U.S. at 182.

## III.  LEGAL ANALYSIS

### A.    The Plaintiff's ADEA Claims

The plaintiff argues that he is entitled to summary judgment because the defendants have not shown that younger employees were reprimanded and terminated for refusing requests to staff the James Creek project. Pl.'s Mot. at 4. He further argues that the defendants' failure to respond to his complaints of an odor at the UPO's Alabama Avenue office and subsequent response to the complaints of a younger employee also evidences age discrimination.[4] Pl.'s Opp'n at 8.

The ADEA provides in pertinent part that it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual . . . because of such individual's

---

[4] The plaintiff also makes several arguments about his claim under the Whistleblower Protection Act, 5 U.S.C. § 2302(b). Because the Court has already dismissed the Whistleblower Protection Act claim with prejudice, see ECF No. 58, these arguments are not addressed in this Memorandum Opinion.

age." 29 U.S.C. § 623(a)(1). However, it is not "unlawful for an employer . . . to discharge or otherwise discipline an individual for good cause." Id. § 623(f)(3). To succeed on an ADEA claim, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." Gross v. FBL Fin. Servs., 557 U.S. 167, 180 (2009). In the absence of direct evidence of discrimination, this Circuit applies the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), in cases brought under the ADEA. See Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006); Paquin v. Fed. Nat'l Mortg. Ass'n, 119 F.3d 23, 26 (D.C. Cir. 1997). The first stem in the McDonnell Douglas test is to determine whether the plaintiff has established a prima facie case of discrimination. 411 U.S. at 802. In order to establish a prima facie case in the context of an ADEA employment termination claim, the plaintiff must show that he (1) belongs to the statutorily protected age group, (2) was qualified for the position, (3) was terminated, and (4) was disadvantaged in favor of a younger person. Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999); Jones v. Bernanke, 493 F. Supp. 2d 18, 27 (D.D.C. 2007), aff'd, 557 F.3d 670 (D.C. Cir. 2009). Once this first prong is satisfied, the burden of production shifts to the defendant to identify a legitimate nondiscriminatory reason for the challenged employment action. McDonnell Douglas, 411 U.S. at 802. If the defendant meets this burden of production, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). However, "[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." Fischbach v. Dep't of Corrs., 86 F.3d 1180,

1183 (D.C. Cir. 1996) (quoting Pignato v. Am. Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994)).

At the summary judgment stage, however, the plaintiff's ability to establish a prima facie case is of little concern to the Court. As the Circuit held in Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008),[5] "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Thus where, as here, an employer moves for summary judgment, the Court is confronted with "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason" for the adverse employment action, and that the real reason for the employer's action was to "intentionally discriminate[] against the employee on the basis of [age]." Id.

## 1.      The Plaintiff's Claims Against the Individual Defendants

The defendants argue first that the individual defendants are entitled to summary judgment because individuals cannot be liable under the ADEA. Defs.' Mem. at 8. Another member of this Court agreed recently with the defendants' position, holding that "there is no individual liability under . . . the ADEA." Smith v. Janey, 664 F. Supp. 2d 1, 8 (D.D.C. 2009), aff'd sub nom, Smith v. Rhee, No. 09-7100, 2010 WL 1633177 (D.C. Cir. 2010). And although this Circuit has not directly addressed the issue, several other federal circuit courts agree that the ADEA does not contemplate individual liability. See, e.g., Parikh v. UPS, 491 F. App'x 303,

---

[5] Although Brady considered the McDonnell Douglas test in the context of a claim brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, the logic of Brady applies in the ADEA context as well. See Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (applying Brady framework to retaliation claim under the ADEA).

308 (3d Cir. 2012) ("Neither Title VII nor the ADEA provides for individual liability."); <u>Guerra v. Jones</u>, 421 F. App'x 15, 17 (2d Cir. 2011) ("[D]ismissal of the . . . ADEA claims against the individual [d]efendants was appropriate as [the] statute [does not] subject[] individuals, even those with supervisory liability over the plaintiff, to personal liability."); <u>Jones v. Sternheimer</u>, 387 F. App'x 366, 368 (4th Cir. 2010) ("[T]he ADEA . . . do[es] not provide for causes of action against defendants in their individual capacities.").  This Court agrees with those courts, and accordingly grants summary judgment to the defendants on the plaintiff's ADEA claims against the individual defendants.

### 2. The Plaintiff's Claims Against the UPO

The defendants next argue that that the UPO has articulated a legitimate, non-retaliatory reason for reprimanding and terminating the plaintiff.  Defs.' Mem. at 10.  Specifically, they contend that the UPO disciplined and subsequently terminated the plaintiff "based upon conduct that [the] [p]laintiff does not dispute and acknowledges was insubordinate."  <u>Id.</u> at 11.  During his deposition, the plaintiff conceded that he "didn't do the directive that he was given to [him] for James Creek."  Defs.' Facts, Ex. F (Pl. Dep. Tr.) at 78:14-19.  The defendants submitted declarations with their motion for summary judgment indicating that the UPO's request that the plaintiff staff the James Creek project "was well within [the plaintiff's] job description and management's prerogative to direct employees to provide needed services to fulfill its obligations."  Defs.' Facts, Ex. A (Thomas Decl.) ¶ 18.  Indeed, the job description for the Assistant Director position includes as part of the position's "duties and responsibilities" the task of "[a]ssist[ing] the Director in the daily administration of division projects as directed or

assigned, including but not limited to staff supervision [and] program facilitation as needed."[6] Defs.' Facts, Ex. E (Job Description). And the plaintiff's termination of employment letter states that "[t]he reason for" terminating his employment was his "continuing insubordination and conduct which impugns or compromises the integrity of [the] UPO" and specifies that he had "repeatedly refused to oversee and operate the James Creek project of the . . . [Division] as repeatedly directed which [was] part of [his] duties and responsibilities as Assistant Director" of the Division. Defs.' Facts, Ex. Y (Termination Letter).

It is well established that a court "may not second guess an employer's personnel decision absent demonstrably discriminatory motive." Fischbach, 86 F.3d at 1183 (internal quotation marks and citation omitted). In light of the defendants' assertion that the plaintiff was reprimanded and later terminated for insubordination and not because of his age, as well as the plaintiff's own concession that he refused his supervisor's request to staff the James Creek project, the Court finds that the defendants have proffered a sufficiently nondiscriminatory reason for the termination.

The burden thus shifts to the plaintiff to demonstrate that the defendants' proffered explanation is pretextual. Burdine, 450 U.S. at 253-55. "'[T]o survive summary judgment the plaintiff must show that a reasonable jury could conclude from all the evidence that the adverse employment decision was made for a discriminatory [or retaliatory] reason.'" Geleta v. Gray, 645 F.3d 408, 413 (D.C. Cir. 2011) (alteration in original) (citation omitted).

---

[6] The plaintiff provides a slightly different version of his job description. See Pl.'s Req. at 7. However, his description states that a "major dut[y]" of the Assistant Director is to "[a]ssist Director in day to day management and operations of Youth Services Divisions Programs and oversee special projects." Id. His description also lists among the "specific duties and responsibilities" the task of "[a]ssisting Director with daily administration of division projects and staff supervision." Id. The plaintiff's description of his duties are therefore consistent with the job description provided by the defendants.

First, the plaintiff argues that if his job performance "during the six month introductory period of his employment . . . . was an issue[,] [the] [d]efendants[] would have terminated him on those grounds and not insubordination."  Pl.'s Opp'n at 2.  This argument, however, does not undermine the defendants' stated reasons for the plaintiff's termination.  Simply because the plaintiff had performed adequately during his first six months with the UPO does not preclude the determination that he was thereafter insubordinate.

The plaintiff next outlines his positive contributions to Division projects other than the James Creek project, presumably in an attempt to argue that those positive contributions indicate that he was not insubordinate and thus should not have been reprimanded or terminated.  Pl.'s Opp'n at 3-6.  Again, this reasoning is not helpful to the plaintiff.  The defendants' contention is that the plaintiff was insubordinate with respect to specific repeated requests concerning the James Creek project and not that his performance was unacceptable in other respects.  Defs.' Mem. at 11-12; see also Defs.' Facts, Ex. A (Thomas Decl.) ¶¶ 16-18.

Next, the plaintiff notes that other younger employees were or should have been available to staff the James Creek project, and argues that the fact that those other employees were not reprimanded or terminated for refusing to staff the project supports his position that the UPO's decision to terminate his employment was discriminatory.  Pl.'s Mot. at 4, 7-8; Pl.'s Opp'n at 6-8.  Where a plaintiff seeks an inference of discrimination based on "disparate treatment," he must show that "all of the relevant aspects of [his] employment situation were 'nearly identical' to those" of the other employees who did not suffer similar adverse employment actions.  See Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (finding that a female plaintiff failed to demonstrate disparate treatment where comparator was both male and

"lower in seniority" than the plaintiff); see also Barbour v. Browner, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (finding that two employees were not similarly situated where one was a GS-12 and the other a GS-13); Holbrook v. Reno, 196 F.3d 255, 261-62 (D.C. Cir. 1999) (holding that employees of differing seniority levels were not similarly situated). Here, the other employees the plaintiff contends were treated differently—i.e., those who were not terminated for refusal to staff the James Creek project—were either case managers in the UPO's Youth Services Division or in one case, a Retention Placement Specialist who "shared duties" with one of the case managers. See Defs.' Facts, Ex. A (Thomas Decl.) ¶ 15; Pl.'s Opp'n at 6-7. The plaintiff, on the other hand, was the Assistant Director of the Youth Services Division. See Defs.' Facts, Ex. D (Offer Letter) ("Your position will be Assistant Director, Youth Services . . . ."). The plaintiff and the other employees he references were therefore not similarly situated, and an inference of discrimination is not created by his dissimilar treatment.

The plaintiff also contends that he "agreed to work the James Creek Project one day a week on Mondays." Pl.'s Mot. at 10 (citing Pl.'s Mot., Ex. 5 (Email Correspondence)). He argues, without any citations to the record, that this "would have left seven staff members including defendant Rorie who were under the age of 40 to work the remaining two days as required by the grant." Id. However, the plaintiff was asked to staff the James Creek project for three days a week, and thus his willingness to work one day a week does not undermine the defendants' stated reason for terminating his employment.

Finally, the plaintiff argues that the UPO was "aware of the odor in the Alabama Avenue site prior to" receiving an email from a younger, female employee. Pl.'s Opp'n at 8. And to support his position that he was the victim of discrimination based on his age, the plaintiff

contends that his complaints were ignored "until a couple months later when [the defendants] received" the younger employee's email.  Id.  The defendants respond that these claims are not properly before the Court as potential evidence of age discrimination because the plaintiff's complaints about the odor were not included in his EEOC complaint.  Defs.' Mem. at 27 (citing Defs.' Facts, Ex. N (EEOC Complaint)).  To be sure, as this Circuit has noted in the Title VII context, "'[t]he goals behind the requirement of prior resort to administrative relief would be frustrated if the filing of a general charge with the EEOC would open up the possibility of judicial challenges to any related conduct that took place in connection with the employment relationship.'"  Park v. Howard Univ., 71 F.3d 904, 908 (D.C. Cir. 1995) (citation omitted).  And the Fifth Circuit has explicitly held in the ADEA context that "[i]n assessing whether a charge properly exhausts a particular claim," courts "'construe[] an EEOC complaint broadly,' but [] will only find a claim was exhausted if it could have been 'reasonably . . . expected to grow out of the charge of discrimination.'"  Jefferson v. Christus St. Joseph Hosp., 374 F. App'x 485, 490 (5th Cir. 2010).  But neither case directly addresses the inclusion in an EEOC complaint of the particular conduct from which a plaintiff seeks an inference of discrimination.  In other words, the cases stand for the proposition that an EEOC complaint must include allegations concerning the type of discrimination alleged, but they do not indicate that a plaintiff must include each and every fact supporting his discrimination charge.  See Park, 71 F.3d at 908 (finding that plaintiff's EEOC complaint failed to exhaust claim of hostile work environment where complaint included neither the words "hostile work environment" nor any allegations to support such a claim); Jefferson, 374 F. App'x at 490 (finding that plaintiffs had failed to exhaust claims of retaliation or of race, age, and national origin discrimination where EEOC complaints made no mention of

the alleged retaliation or discrimination and the plaintiffs additionally failed to check a box on the complaint form indicating that they wished to pursue such claims).

Here, the plaintiff's EEOC complaint clearly alleges age discrimination, and so the Court will consider the plaintiff's claims about the odor at the Alabama Avenue facility as the basis for a possible inference of discrimination. Unfortunately for the plaintiff, his allegations about the delay in addressing the odor are insufficient to permit an inference of age discrimination. In particular, the plaintiff's allegations do not explain how he was treated differently from any other employee. The UPO's failure to address the source of the odor when the plaintiff complained impacted not only the plaintiff, but also the other employees working at the Alabama Avenue facility. Defs.' Facts ¶ 43. While the UPO could have responded to the complaints in a more timely fashion, the fact remains that the defendant eventually responded to not only the plaintiff's complaints, but also the complaints of the other employees who were affected by the odor. Id. ¶¶ 43-44. The Court therefore finds that the plaintiff's allegations about the odor at the Alabama Avenue facility do not create an inference of discrimination.

Because the plaintiff has failed to produce evidence sufficient for a reasonable jury to conclude that the defendants' stated reasons for terminating his employment amount pretext, and because his claims against the individual defendants are deficient as a matter of law, the Court must grant the defendants' motion for summary judgment and deny the plaintiff's motion for summary judgment.

**B.      The Plaintiff's Motion to Amend his Complaint**

The plaintiff seeks leave to amend his complaint to include claims under the False Claims Act, 31 U.S.C. §§ 3729-3730 (2006), and the Fair Labor Standards Act, 29 U.S.C. § 201 (2006).

Pl.'s Amend Mot. at 1-3.  The defendants urge the Court to deny the plaintiff's motion for failure to comply with this Court's local rules, as well as on the grounds of undue delay, prejudice, and futility.  Defs.' Amend Opp'n at 1.

As an initial matter, the Court agrees that the plaintiff has failed to comply with Local Civil Rules 7(i) and 15.1, both of which require a party seeking leave to amend a pleading to furnish the Court with a copy of the proposed amended pleading.  <u>See</u> Local Civ. R. 7(i); Local Civ. R. 15.1.  And as the defendants correctly note, Defs.' Amend Opp'n at 5, the Court previously admonished the plaintiff of his responsibility to be familiar with this Court's local rules, and with Rule 7 in particular.  <u>See</u> August 23, 2013 Minute Order (providing an internet address for the Court's Local Civil Rules).

Even if the plaintiff had provided the Court with a copy of his proposed amended complaint, the representations he makes in his motion make clear that neither statutory provision referenced in his motion is a proper basis for relief.  As to the False Claims Act, the plaintiff believes that "the [d]efendants retaliated against [him] because he blew the whistle on" the defendants for "filing false claims as it relates to the Stimulus grant they received from the Federal Government."  Pl.'s Amend Reply at 1-2.  These allegations are not materially different from those made in reference to the plaintiff's Whistleblower Protection Act claim, and as the defendants rightly note, Defs.' Amend Opp'n at 6, the plaintiff has been on notice for well over a year that his Whistleblower Protection Act claim was deficient, as this Court indicated in its October 10, 2012 Memorandum Opinion dismissing several of his claims, <u>Bilal-Edwards</u>, 896 F. Supp. 2d at 93 n.8.

The plaintiff faults the Court for failing to account in its prior Memorandum Opinion for the fact that he "had protection under the American Recovery and [Rei]nvestment Act of 2009." Pl.'s Amend Reply at 2. This is unreasonable. The plaintiff's reply memorandum in support of his motion to amend his complaint is the first time that the American Recovery and Reinvestment Act has been referenced, and even if it were not the case, the plaintiff's complaint included no allegations that he "complied with the prerequisites to bringing suit that are specified in detail in the statute." Williams v. New York City Dep't of Ed., __ F. Supp. 2d __, __, 2013 WL 5226564, at *15 (S.D.N.Y. 2013) (dismissing plaintiff's American Recovery and Reinvestment Act retaliation claim for failure to exhaust administrative remedies). In short, the plaintiff has been in possession of facts necessary to bring his various retaliation claims since he was terminated on May 3, 2010, and he has also been on notice that his existing retaliation claims were deficient since those claims were dismissed on October 10, 2012. Further, allowing an amendment at this late juncture would prejudice the defendants given that discovery has now been closed for nine months and both parties have filed dispositive motions. Indeed, the plaintiff was the first party to move for summary judgment, having done so six months before he filed his motion to amend his complaint. This constitutes undue delay, and the Court therefore denies the plaintiff's motion to amend his complaint to include claims under the False Claims Act.

In any event, the defendants argue that an amendment adding the FLSA claims would be futile because they are time-barred. Defs.' Amend Opp'n at 10. "The statute of limitations under both the [District of Columbia Wage Payment and Collection Law ("DC Wage Law")] and [the] FLSA . . . is only three years." Ventura v. Bebo Foods, Inc., 738 F. Supp. 2d 8, 30 (D.D.C. 2010) (citing 29 U.S.C. § 255(a); D.C. Code § 32-1013). And this Circuit has held that FLSA

claims accrue with each pay period.  Figueroa v. D.C. Metro. Police Dep't (Figueroa I), 633 F.3d 1129, 1135 (D.C. Cir. 2011); see also Dover v. Medstar Wash. Hosp. Ctr., Inc., __ F. Supp. 2d __, __, 2013 WL 5824075, at *2-3 (D.D.C. 2013) (dismissing DC Wage Law claims as time-barred).  Thus, the last date on which the plaintiff's FLSA claims could have accrued was the date of his termination, which was May 3, 2010.  Because it is now almost four years from that date, the plaintiff's FLSA claims are time-barred.

Moreover, Rule 15(c)(1)(B) cannot save the plaintiff's FLSA claim.  The Rule allows amendments to "relate back" to the date of the original pleading only where the amendment "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  But "[r]elation back is improper when the amended claim 'asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'"  Dover, __ F. Supp. 2d at __, 2013 WL 5824075, at *3 (quoting Mayle v. Felix, 545 U.S. 644, 650 (2005)).  "The underlying question is whether the original complaint adequately notified the defendants of the basis for liability the plaintiffs would later advance in the amended complaint."  Meijer, Inc. v. Biovail Corp., 533 F.3d 857, 866 (D.C. Cir. 2008).

"An employee is entitled to the federal minimum wage and overtime unless specifically exempted by the FLSA," and "[t]he employer bears the burden of demonstrating that its employee is exempt . . . ."  Cannon v. District of Columbia, 717 F.3d 200, 204 (D.C. Cir. 2013).  Both the D.C. Wage Law and the FLSA "provide [] cause[s] of action for employees to sue their employers for unpaid minimum wages or overtime compensation."  Ruffin v. New Destination, 800 F. Supp. 2d 262, 268 (D.D.C. 2011).  There are "two elements of an FLSA overtime claim . .

. : (1) performance of work, and (2) improper compensation." <u>Figueroa v. District of Columbia</u>

(<u>Figueroa II</u>), 923 F. Supp. 2d 159, 168 (D.D.C. 2013) (citing <u>Figueroa I</u>, 633 F.3d at 1135); <u>see</u>

<u>also</u> D.C. Code § 32-1302 ("Every employer shall pay wages <u>earned</u> to his employees . . . .")

(emphasis added).  Here, the allegations contained in plaintiff's complaint could not adequately

put the defendants on notice of the FLSA claims the plaintiff now wants to raise.  The complaint

does allege in passing that "[d]efendant Thomas falsely stated that [the] [p]laintiff would not

receive overtime for the extraordinarily time consuming work project."  Compl. ¶ 67.  However,

the most that the allegation communicates is the plaintiff's belief that he deserved more

compensation, not, as he argues in his motion to amend, that he intended to challenge whether

his position was classified as exempt or non-exempt under the FLSA.  <u>See</u> Pl.'s Amend Mot. at

2.  Further, a FLSA claim would need to be "'supported by facts that differ in both time and type

from those the original pleading set forth.'"  <u>Dover</u>, __ F. Supp. 2d at __, 2013 WL 5824075, at

*3 (quoting <u>Mayle v. Felix</u>, 545 U.S. 644, 650 (2005)).  The plaintiff would need to adduce facts

concerning the number of alleged overtime hours worked, the compensation he believed he was

owed, and whether the FLSA grants employees in the plaintiff's position the right to overtime

compensation.  By contrast, the original pleading in this case set forth allegations of

discrimination based on age, retaliation based on whistleblowing, and tortious conduct, none of

which involved the plaintiff's compensation or right to overtime compensation.  <u>See</u> Compl. ¶¶

81-102.  Accordingly, the Court finds that the plaintiff's proposed FLSA claims do not relate

back to his original complaint, and denies as futile the plaintiff's motion to amend his complaint

to add FLSA claims.[7]

---

[7] In any event, the plaintiff has been in possession of the facts underlying a potential FLSA claim since he first filed
his complaint.  To allow amendment at this time, after the conclusion of discovery and the filing of dispositive

(continued . . . )

## IV.  CONCLUSION

For the reasons set forth above, the Court will grant the defendants' motion for summary judgment, and deny both the plaintiff's motion for summary judgment and his motion to amend his complaint.[8]

**SO ORDERED** this 21st day of February, 2013.

REGGIE B. WALTON
United States District Judge

---

( . . . continued)
motions, would prejudice the defendants.

[8] The Court will contemporaneously issue an order consistent with this Memorandum Opinion.